AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> **6/10/2024**
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: ___CGM___ DEPUTY

United States of America,

v.

JOSEPH DANTE TAYLOR,

Defendant(s)

Case No. **2:24-mj-03406-DUTY**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 20, 2024 and May 21, 2024 in the county of Los Angeles in the Central District of California,

the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1361 | Depredation of Government Property, More Than $1,000 |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Thomas Vasquez*
*Complainant's signature*

Thomas Vasquez,  FPS SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  ___6/10/24___

_____
*Judge's signature*

City and state:  ___Los Angeles, California___     Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lisa J. Lindhorst (x6772)

## AFFIDAVIT

I, Thomas J. Vasquez, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal
complaint and arrest warrant against JOSEF DANTE TAYLOR
("TAYLOR") for a violation of 18 U.S.C. § 1361: Depredation of
Government Property, more than $1,000.

2.    This affidavit is also made in support of warrants to
search:

        a.    The person of JOSEF DANTE TAYLOR ("TAYLOR"), as
described more fully in Attachment A-1;

        b.    A 2007 black Cadillac SUV with California license
plate number ****530 (the "SUBJECT VEHICLE"), registered to
TAYLOR, as described more fully in Attachment A-2;

        c.    TAYLOR's residence in Long Beach, California
("TAYLOR's RESIDENCE"), as described more fully in Attachment A-
3.

3.    The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 1361 (Depredation of Government Property) and 111
(Assaulting/Impeding/Interfering with Federal Officer or
Employee) (the "Target Offenses"), as described more fully in
Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated
herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint, arrest warrant, and search warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the United States Department of Homeland Security, Federal Protective Service ("FPS").  I have been in this position since August 2017.  As a SA, my official duties are to investigate crimes against the United States that originate on or have a nexus to United States government properties or employees, including depredation of government property.  I also investigate assault on government officials, theft of government property, threats to government officials, impersonation of government officials, arson, prohibited firearm possession on government property, and narcotic-related offenses.  Since 2017, I have conducted numerous criminal investigations, especially threats against federal officials and depredation of government property, and have received trainings on criminal investigations and depredation of government property cases.

6.    From 2013 to July 2017, I was a uniformed law enforcement officer with the FPS.  In that position, I conducted

various preliminary investigations, including depredation of
government property.  Also, I was responsible for responding to
crimes in progress at FPS protected facilities such as threats
to government employees, possession of narcotics, assaults on
government employees, theft of government property, civil
disturbances, and depredation of government property.  I
received trainings on how to conduct preliminary depredation of
government property investigations.

7.    I have completed two basic training courses at the
Federal Law Enforcement Training Center in Glynco, Georgia,
which included training in the investigation of various federal
crimes such as depredation of government property.

8.    During my 11-year tenure as a law enforcement officer,
I have participated in numerous criminal and depredation of
government property investigations.  And based on my training
and experience, I know people who commit depredation of
government property offenses communicate about their conduct via
text, call and online.  I am also aware that the persons
committing depredation of government property carry weapons,
including firearms, paint ball guns, and/or BB/Pellet guns, on
their persons or cars.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    In April and May of 2024, three federal buildings in
Long Beach were shot at with a BB gun, causing thousands of
dollars in damage.  Specifically, the Social Security
Administration ("SSA") office at 2005 Long Beach Boulevard, Long
Beach, California, was shot at on approximately April 26, May

20, and May 21, 2024.  There were no witnesses to the April 26, 2024 shooting, but SSA staff reported damage to windows consistent with shots from a BB gun type projectile.  On May 20, 2024, at approximately 10:08 a.m., the same building was shot at by a BB gun, and video shows only one vehicle driving past at the time – a black Cadillac SUV with distinct chrome rims.  The next morning, Onsite Protective Security Officers ("PSOs") saw that another window had been damaged by what appeared to be similar BB-gun projectiles.  Soon after discovering this additional window damage, PSOs saw what appeared to be the same black Cadillac SUV driving past the SSA office and the PSOs took photographs capturing the license plate, which matched the SUBJECT VEHICLE, which (though unregistered) appeared to be owned, controlled, and driven by TAYLOR during the relevant time period.

10.  Later that same day, May 21, 2024, the Customs and Border Protection ("CBP") forensic laboratory located at 3265 N. Lakewood Boulevard in Long Beach reported their facility's windows were shot at and damaged by BB gun type projectiles.  On May 23, 2024, the Long Beach Federal Office Building ("FOB"), 501 W. Ocean Boulevard in Long Beach, reported one of their windows was shot at and damaged by BB-gun style projectiles.

11.  I examined the window damage to the three federal facilities and observed similar strike marks at all three, suggesting each was caused by a BB or pellet gun.  The Long Beach SSA office and Long Beach FOB windows impact measurements were identical and appeared to be from the same weapon, while

the impact to the CBP windows were smaller and appeared to be caused by a different BB and/or Pellet gun.

12.   FPS learned the Long Beach Police Department Violent Crimes Unit ("LBPD") was investigating multiple incidents of someone with a BB gun driving the SUBJECT VEHICLE shooting at various commercial establishments and city transit buses in Long Beach, the damage of which appears consistent with the damage to the three federal buildings described above.

13.   LBPD learned of TAYLOR'S identity through his tie to the SUBJECT VEHICLE, in part through a receipt from a vehicle service visit to a Walmart in December 2023.  The paperwork for that service listed TAYLOR as the customer and included his phone number.  A License Plate Recognition (LPR) search on the SUBJECT VEHICLE's license plates also showed it parked frequently across from the address TAYLOR listed as his residence with the Department of Motor Vehicles ("DMV") and the residence he reported to law enforcement as his home on April 28, 2024.  Law enforcement also surveilled the suspect car in early June 2024 and saw TAYLOR enter the car while it was parked next to his residence and then drive away.

14.   The investigation also tied TAYLOR to a unique plaid jacket with brown leather sleeves and horizontal stripes on the cuffs.  On May 21, 2024, just three miles away from the SSA office and just thirty minutes after the PSOs as the SSA office had photographed the SUBJECT VEHICLE following the May 21 shooting at the SSA office, a local Kentucky Fried Chicken ("KFC") restaurant was shot at with a BB gun, and the resulting

damage to the KFC windows was nearly identical to that of the
SSA office.  Moments before that KFC shooting, video captured
the SUBJECT VEHICLE with its window down and the driver appeared
to be holding a gun.  The driver also wore a distinct jacket
with horizontal stripes on the cuffs.  In an unrelated incident
one month prior, law enforcement interacted with TAYLOR and the
Body worn camera from that interaction shows TAYLOR wearing what
appears to be the same unique jacket with horizontally striped
cuffs.  Additionally, on June 3, 2024, while conducting
surveillance, I saw TAYLOR driving the SUBJECT VEHICLE and
wearing the same distinct jacket.

15.  Based on my training and experience, there is probable
cause to believe that TAYLOR has violated 18 U.S.C. § 1361 and
that the search of TAYLOR's person, the SUBJECT VEHICLE, and
TAYLOR's RESIDENCE will lead to evidence of the Target Offenses.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, my review of
surveillance footage, and my own knowledge of the investigation,
I am aware of the following:

**A.   The SUBJECT VEHICLE Drives by the Long Beach Social
Security Administration Office and Shoots at the
Facility with a BB Gun**

17.  Surveillance footage, which I have reviewed, shows
that on May 20, 2024, at approximately 10:08 a.m., a black
Cadillac SUV drove by the SSA office at 2005 Long Beach
Boulevard in Long Beach, California, with the right front
passenger window down.  As the vehicle drove past, the SSA

facility's window was hit with a BB-gun-type projectile. Law
enforcement reports state that witnesses reportedly heard the
impact of the projectiles on the windows.  Surveillance footage
revealed that the black Cadillac SUV pictured below was the only
vehicle in the southbound lanes at the time the window was
struck.  That SUV is consistent with the SUBJECT VEHICLE.



18.  The following morning, on May 21, 2024, the onsite
PSOs noticed that yet another window at that SSA office had been
struck and damaged by a BB-gun-type projectile. After
discovering the additional damage, the PSOs observed what
appeared to be the same black Cadillac SUV from the May 20
shooting, driving past the SSA Office with its right passenger
window down.  The PSOs reported that the vehicle was occupied by
two black male adults who were staring back towards the
facility.  Officer O.C. took photos of the vehicle at 9:49 a.m.
that morning, capturing the license plate -- CA ****530.
Officer P.D. subsequently told law enforcement that he did not

see the driver, but he may be able to recognize the passenger.
Officer P.D. reviewed a six-pack photo lineup which depicted
TAYLOR in the number 3 position.  Officer P.D. identified the
male in the number 1 position as the passenger.  The male in the
number 1 position has not been associated with this
investigation.

19.  On April 26, 2024, almost a month before the incidents
referenced above, the same SSA office reported window damage due
to BB-gun-type projectiles.  I am unaware of any footage
capturing this incident or any sighting of the SUBJECT VEHICLE
during that shooting.  However, I have observed the damage from
the April 26 shooting and it appears almost identical to the
projectile marks from the May 20 and May 21 shootings.

**B.   Windows from Two Additional Federal Buildings are
      Discovered Damaged on May 21 and May 23, 2024,
      Consistent with Having been Caused by a BB Gun**

20.  Two additional federal buildings experienced damage
from BB-gun-type projectiles in late May 2024.  First, on May
21, 2024 (the same day the SSA Office was shot at), the CBP
laboratory located at 3265 North Lakewood Boulevard in Long
Beach reported that multiple windows were shot at and damaged by
BB-gun-type projectiles.  On May 23, 2024, the Long Beach FOB
reported BB-gun-type damage to their facility's windows as well.
I have not yet been able to obtain surveillance footage from
either incident, and I am unaware of whether the SUBJECT VEHICLE
was present at either incident when the windows were shot out.
However, I examined the window damage to all three facilities,
and the window damage for two of the buildings – the Long Beach

SSA office and Long Beach FOB facility – had consistent strike marks.  The impact measurements were identical and appeared to be from the same weapon.  The impact to the CBP windows, however, were smaller and appeared to be caused by another BB and/or Pellet gun.



*Figure 1. Long Beach SSA (May 21, 2024)*

### C.   TAYLOR Appears to Own and Drive the SUBJECT VEHICLE and Parks it Near His Home

21.   LBPD Detective O.D. queried the SUBJECT VEHICLE's plates and DMV records, and spoke to the vehicle's last registered owner.  The investigation revealed that the vehicle has not been registered for over a year.  The prior owner sold the car to a Cadillac dealership in Pasadena, and the dealership sold it to a third-party auctioneer in 2023.  In LBPD's experience, third-party car auctioneers are not cooperative or forthcoming with law enforcement about the identity of their

buyers.  Someone bought the car in late 2023 and has not registered the vehicle.

22.  LBPD Detective O.D. conducted a Carfax query of the SUBJECT VEHICLE's license plates to locate any shops that may have serviced the vehicle.  This search revealed that the SUBJECT VEHICLE was last serviced on December 9, 2023, at a Walmart Auto Care Center in Lakewood, California.  LBPD Detective O.D. obtained the service receipt and the customer listed was "JOSEPH TAYLOR" with an associated phone number listed as ***-***-0245.  A query of law enforcement databases confirmed that TAYLOR was associated with that phone number and that his home address was listed as TAYLOR's RESIDENCE.  California DMV records also list that same address as TAYLOR's.

23.  Detective O.D. also conducted a license plate recognition ("LPR") query of the SUBJECT VEHICLE, which revealed the car was routinely parked near the intersection of Temple Avenue and Spaulding Street in April and late May of 2024, which is right next to the apartment complex in which TAYLOR's self-reported RESIDENCE is located.

24.  On June 3, 2024, I and other FPS agents located and conducted surveillance on the SUBJECT VEHICLE, which at the time was parked at Orizaba Park in Long Beach, across from the apartment complex in which TAYLOR's RESIDENCE is located.  During this surveillance, I observed TAYLOR walking towards the SUBJECT VEHICLE from the direction of his apartment complex and I saw him enter the SUBJECT VEHICLE and drive away in that car.

25.  To ensure we remained undetected, I did not attempt to get close enough to see TAYLOR enter or exit a specific apartment. Instead, I queried apartment Unit #2's lease records. The records revealed that the official tenant in Unit 2 is a female who appears to be TAYLOR's significant other, and she listed a juvenile on the lease who shares the same full name and spelling as TAYLOR.  The female resident obtained the unit through subsidized housing, which in my experience means she cannot list another adult on the lease.

**D.   TAYLOR's Jacket Matches the Distinct Jacket Worn by the Suspected Shooter**

26.  LBPD Detective O.D. provided me with LBPD body-camera footage capturing TAYLOR's involvement in a prior, unrelated incident on April 28, 2024, at Orizaba Park at 1435 Orizaba Avenue in Long Beach, which is across from TAYLOR's residence. Witnesses described an individual consistent with TAYLOR's description and stated that he was shooting at squirrels with a BB gun.  When the officers responded, they saw a juvenile toss the BB gun into a bush.  Before recovering the BB gun, TAYLOR spoke to law enforcement and identified himself by name and reported that he lived at 2726 E. Spaulding St., Apt. 2., Long Beach, California 90804, and that the juvenile on scene was his stepson.  While Officers recovered the BB gun and spoke with TAYLOR, TAYLOR was captured on body-worn camera wearing a plaid color jacket with brown leather sleeves with two light brown horizontal lines near the sleeves' cuffs.

11



27.   While surveilling the SUBJECT VEHICLE on June 3, 2024,
I observed TAYLOR driving that car while wearing what appeared
to be the same jacket.  I along with other FPS SA's followed
TAYLOR and I saw him get out of the SUBJECT VEHICLE and walk to
an ATM.  I immediately recognized TAYLOR from the body-worn
camera referenced above and I confirmed he was wearing the same
jacket depicted in the body-camera footage, as shown below.



As mentioned above, a person suspected of shooting a BB-gun-type weapon at a KFC was caught on video on May 21, 2024 wearing what appears to be the same jacket, less than 30 minutes after PSOs saw the SUBJECT VEHICLE at the SSA Office.  Specifically, at approximately 10:13 a.m. on May 21, 2024, LBPD received a call from the KFC restaurant at 4001 East Anaheim Street in Long Beach regarding a possible shooting.  Officers responded and saw three BB-gun-type projectile impact marks on the KFC windows that appear to match the marks at the Long Beach SSA.  Long Beach City Cameras, which I have reviewed, captured the intersection of Anaheim and Redondo Avenue, moments before the reported damage to KFC.  That video showed the suspect vehicle turn from Redondo Avenue onto Anaheim Street, at which time the

13

footage reveals a partial image of the driver.  Although the
driver's face was not visible, he appeared to be wearing the
same plaid-type jacket worn by TAYLOR in the images depicted
above, with the same horizontal lines on the cuff.
Additionally, the image shows what appears to be a handgun-type
weapon in the driver's right hand.  The handgun's lower receiver
appears black, and the upper receiver appears silver/chrome. No
passenger could be seen in the vehicle.

**E.   LBPD Responded to Multiple Additional BB Gun Incidents involving the SUBJECT VEHICLE**

28.  In addition to the KFC shooting referenced above, LBPD
has been investigating multiple shootings involving similar BB
gun style damage throughout April and May of 2024, several of
which include footage showing the shooter was in the suspect
vehicle.



29.  According to LBPD reports, three times in April 2024,
someone in a Black Cadillac SUV with chrome rims shot up the So

Cal Performance Automotives store at 1887 Long Beach Boulevard
with a BB gun.  The first shooting was on April 17, 2024, and
the reporting party saw a black Cadillac SUV stop directly in
front of the business and a BB gun protruded from the passenger
window as it shot towards the glass window, and then the vehicle
fled.  Three days later, on April 20, 2024, the reporting party
saw what appeared to be the same SUV drive southbound on Long
Beach Boulevard and slow down directly in front of the store,
and then the reporting party heard rapid fire from what he
believed was from a "CO2 BB gun."  The third shooting occurred
on April 24, 2024, and what appeared to be the same car drove
southbound on Long Beach Boulevard and as it passed the store,
the occupant fired a BB gun into the east facing windows along
the street.  The reporting party did not capture the license
plate during any of the three shootings, but then on May 1,
2024, the reporting party saw what he believed to be the same
vehicle returning, and this time he obtained a license plate of
CA ****530 (the same as the SUBJECT VEHICLE). Total damage to
this location was estimated to be over $1,500.

    30.  According to LBPD reports I have reviewed, four times
in May 2024, LBPD responded to the scene of Transit Buses being
shot up by a BB gun, and each time Metro Transit footage
revealed that the shots were fired from a vehicle consistent
with the SUBJECT VEHICLE:

        a.   On May 3, 2024, at approximately 10:17 a.m., LBPD
officers responded to 68th Street and Cherry Ave., regarding a
Long Beach Transit Bus window being shattered. The bus driver

stated that while driving in the number two lane southbound on
Cherry Ave. and just north of Harding, he heard a loud noise
followed by the glass shatter. LBPD Detective O.D. reviewed the
Long Beach Transit video surveillance camera footage and at the
time of the shooting, the bus drove past a black Cadillac with
the same license plate as the SUBJECT VEHICLE with its front
passenger window down. As the bus drove past the Cadillac, the
Cadillac driver's right arm appears to extend towards the bus as
the side bus windows appeared to shatter. Long Beach Transit
estimated the damage to be just over $3,000.

      b.   On May 16, 2024, LBPD officers responded to a
reported shooting of transit bus windows near intersection of
Anaheim Street and Long Beach Boulevard.  The bus driver stated
that she had stopped the bus and was waiting to load and unload
passengers when she heard glass braking behind her and saw a
broken window towards the rear of the driver's side of the bus.
Two windows had been damaged in a spider-webbed manner with a
small circular indent on both windows.  LBPD Detective O.M.
reviewed the Long Beach Transit surveillance footage and
discovered that while the bus was stopped along the curb, a
black Cadillac with the same license plate as the SUBJECT
VEHICLE with its back passenger window down drove past at the
same moment as the bus's driver side window appears to shatter.
Long Beach Transit estimated the damage to be approximately
$6,000.

      c.   On May 17, 2024, at approximately 3:34 p.m., LBPD
officers responded to the intersection of Long Beach Boulevard

and Bixby Road reference a Long Beach Transit Bus window being shattered. The bus driver stated that at approximately 3:26 p.m., he was driving southbound on Long Beach Boulevard and had entered the intersection of Bixby Road when he heard a pop.  He saw two windows on the driver's side shatter.  The officer observed small strike marks consistent with damage from a BB gun projectile.  LBPD Detective O.D. reviewed the footage and discovered that as the windows shattered, a black Cadillac SUV with its front driver's side window down traveled in the opposite direction.  As the Cadillac passed the bus, the driver's side bus windows appear to shatter.  Damage is estimated to be approximately $6,000.

       d.   On May 20, 2024, LBPD officers responded to the intersection of Pacific Coast Highway and Orange Avenue, regarding a shooting into a Long Beach Transit Bus.  Officers discovered what appeared to be two BB-gun bullet holes in the shattered bus window.  The bus driver stated while he was traveling westbound on Pacific Coast Highway just east of Gundry Avenue, he heard two loud bangs then heard the two rear windows shattering.  LBPD Detective O.D. reviewed footage and discovered that as the windows shattered, a black Cadillac SUV with its front driver's side window down traveled in the opposite direction.  Damage is estimated to be approximately $6,000.

    31.  Finally, as referenced above, LBPD also got a call on May 21, 2024, at approximately 10:13 a.m., about an apparent BB gun shooting at the KFC restaurant at 4001 East Anaheim Street in Long Beach, which caused visible BB gun damage to KFC

17

windows.  Surveillance from a nearby intersection revealed a
black Cadillac with the same license plate as the SUBJECT
VEHICLE with its window down and the driver appeared to be
holding a gun.

> **F.    The Long Beach SSA Office is a Federally Controlled
> Facility and the Damage from the May 20 and May 21,
> 2024 Shootings Exceed $1,000.00 Each**

32.  On May 24, 2024, General Service Administration (GSA)
Property Manager B.L. provided me with a cost estimate for the
damage to the windows at the SSA Long Beach office caused by the
BB-gun-type shootings on May 20 and 21, 2024 (one window each
day).  Each window cost $1,145 (a total of $2,290) and the cost
to remove and board up the windows cost a total of $450.
Repairs for both windows combined, therefore, totaled
approximately $2,740.  B.L. also confirmed that the SSA office
in Long Beach that sustained this damage is rented and
controlled by GSA, which is a federal agency.

## V.  TRAINING AND EXPERIENCE ON DEPREDATION OF GOVERNMENT PROPERTY

33.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct investigations into depredation of
government property, I am aware that persons who commit
depredation of government property may utilize weapons such as
firearms, BB guns, Pellet guns, Paintball guns and may send
electronic communications containing images and/or communicate
about their conduct from digital devices under their physical
control, such as on their person or in their residence.  These
digital devices include, but are not limited to, cell phones.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among other things, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TAYLOR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of TAYLOR's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  CONCLUSION

38.  For the reasons described above, there is probable cause to believe that TAYLOR violated 18 U.S.C. § 1361: Depredation of Government Property, more than $1,000. There is also probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and

instrumentalities of violations of the Target Offenses will be found on TAYLOR's person, as described in Attachment A-1, the SUBJECT VEHICLE, as described in Attachment A-2, and TAYLOR's RESIDENCE, as described in Attachment A-3.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __10th__ day of June, 2024

_____
HONORABLE A. Joel Richlin
UNITED STATES MAGISTRATE JUDGE

23